# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| The Estate of CLAUDE STEVENS, and SHERRY L. VANNORTWICK, in her capacity as the Personal Representative of the Estate of Claude Stevens, | Case No.: <br><br> Hon. |
| *Plaintiffs*, | |
| v. | |
| ANTHONY H. STEWART, WILLIS CHAPMAN, FRANCIS KONIECZKI, VINDHYA S. JAYAWARDENA, ROBERT HILLYER, FRANCIS K. AWOSIKA, RUTH C. ROULEAU, CHRISTINE E. WHITE, LANA McCARTHY, CORRECTIONS OFFICER CAROTON, CORRECTIONS OFFICER JAMES, KEITH BARBER, ERIC MATTSON, LARRY MARSHALL, and BARBARA "DOE," all in their official and individual capacities, | |
| *Defendants*. | |
| _____/ | |

## **COMPLAINT**

NOW COMES Plaintiffs, by and through their attorneys, EXCOLO LAW, PLLC, for their complaint against the above-named Defendants, allege the following:

## PARTIES

1. Plaintiff the Estate of Claude Stevens is the estate of Claude Stevens ("Mr. Stevens"), a deceased person who was formerly in the custody of the Michigan Department of Corrections ("MDOC").

2. Plaintiff Sherry L. Vannortwick ("Ms. Vannortwick") is Mr. Stevens's sister, and is the personal representative of the Estate of Claude Stevens. Ms. Vannortwick is a resident of the City of Wayland, Barry County, Michigan.

3. Defendant Anthony H. Stewart ("Stewart") was, at all times relevant to this complaint, employed by MDOC as the Warden of the Detroit Reentry Center located in Detroit, Michigan.

4. Defendant Willis Chapman ("Chapman") was, at all times relevant to this complaint, employed by MDOC as the Deputy Warden of the Detroit Reentry Center located in Detroit, Michigan.

5. Defendant Francis Konieczki ("Konieczki") was, at all times relevant to this complaint, employed by MDOC as the Administrative Assistant to the Warden of the Detroit Reentry Center located in Detroit, Michigan.

6. Defendant Vindhya S. Jayawardena ("Jayawardena") is a licensed physician and, at all times relevant to this complaint, employed by Corizon Health, Inc. as a site physician at the Detroit Reentry Center located in Detroit, Michigan.

7. Defendant Robert Hillyer ("Hillyer") is a licensed physician and, at all times relevant to this complaint, employed by Corizon Health, Inc. as a site physician at the Detroit Reentry Center located in Detroit, Michigan.

8. Defendant Francis K. Awosika ("Awosika") is a licensed nurse practitioner and, at all times relevant to this complaint, employed by Corizon Health, Inc. at the Detroit Reentry Center located in Detroit, Michigan.

9. Defendant Ruth C. Rouleau ("Rouleau") is a registered nurse and, at all times relevant to this complaint, employed by MDOC at the Detroit Reentry Center located in Detroit, Michigan.

10. Defendant Christine White ("White") is an assistant residential unit supervisor ("ARUS") and, at all times relevant to this complaint, employed by MDOC at the Detroit Reentry Center located in Detroit, Michigan.

11. Defendant Lana McCarthy ("McCarthy") is a health unit manager ("HUM") and, at all times relevant to this complaint, employed by MDOC at the Detroit Reentry Center located in Detroit, Michigan.

12. Defendant Corrections Officer Caroton ("Caroton") is a corrections officer and, at all times relevant to this complaint, employed by MDOC at the Detroit Reentry Center located in Detroit, Michigan.

13. Defendant Corrections Officer James ("James") is a corrections officer and, at all times relevant to this complaint, employed by MDOC at the Detroit Reentry Center located in Detroit, Michigan.

14. Defendant Keith Barber "Barber" was, at all times relevant to this complaint, employed as the Michigan Legislative Corrections Ombudsman located in Lansing, Michigan.

15. Defendant Eric Mattson "Mattson" is an ombudsman analyst and, at all times relevant to this complaint, employed by the Office of Legislative Corrections Ombudsman located in Lansing, Michigan.

16. Defendant Larry Marshall "Marshall" is a dialysis nurse and, at all times relevant to this complaint, employed by CharDonnay Dialysis, Inc. to provide dialysis services at the Detroit Reentry Center located in Detroit, Michigan.

17. Defendant Barbara "Doe" is a dialysis technician and, at all times relevant to this complaint, employed by CharDonnay Dialysis, Inc. to provide dialysis services at the Detroit Reentry Center located in Detroit, Michigan.

18. At all times relevant hereinafter mentioned, each and all of the acts of the Defendants alleged herein were committed by said Defendants while acting within the scope of their employment by the Michigan Department of Corrections, with the exceptions of Mattson and Barbara "Doe" both of whom were employed by CharDonnay Dialysis, Inc., and Defendants Jayawardena, Hillyer, and Awosika,

each of whom are employed as MDOC Contract employees through Corizon Health, Inc.

19. All Defendants are being sued in their official and individual capacities.

20. When the events alleged in this complaint occurred, none of the above-named individuals were acting in furtherance of a legitimate governmental function and thus are not entitled to governmental immunity.

## JURISDICTION AND VENUE

21. The basis of the Court's jurisdiction is 28 U.S.C. § 1331 since this action arises under the Constitution and laws of the United States.

22. This action presents constitutional and statutory claims arising under 42 U.S.C. § 1983, the Eighth Amendment, and Michigan state law.

23. Pursuant to 42 U.S.C. § 1983 and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all the Defendants in their official and individual capacities, for the past violations of Mr. Stevens's constitutional rights and the harm caused by their actions.

24. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391.

## COMPLIANCE WITH PRE-EXHAUSTION REQUIREMENTS

25. Mr. Stevens, prior to his death, had complied in all respects with the Pre-Exhaustion Requirements of the Prison Litigation Reform Act through the appropriate grievance processes of the Michigan Department of Corrections.

26. Mr. Stevens's grievance record is broader than reasonably prudent to fully restate in the instant Complaint, and Plaintiffs thereby incorporates Mr. Stevens's fully-accessible grievance record as if fully reinstated herein.

## FACTUAL BACKGROUND

### A. Incarceration with MDOC

27. Mr. Stevens began serving a three-year prison sentence in MDOC's custody in August 2013.  During his intake evaluation, Mr. Stevens's physical examination uncovered nothing remarkable.

28. While Mr. Stevens had undergone open heart surgery in November 2008, an assessment of his cardiovascular system at intake revealed "[r]egular rhythm.  No murmurs, gallops or rubs."

29. In mid-November 2013, Mr. Stevens began suffering from flu-like symptoms. Approximately one week later, he began experiencing decreased urine output and increased pain in his lower abdomen.  MDOC medical staff failed to treat these symptoms or perform any diagnostic tests to determine their medical origins.

30. In mid-December 2013, MDOC medical staff finally referred Mr. Stevens to McLaren Greater Lansing Hospital ("McLaren") for medical treatment.  He

informed hospital physicians that "he was moved around quite a bit during this time frame, and subsequently he was unable to receive adequate medical treatment."

31. Diagnostic testing revealed that Mr. Stevens suffered from acute renal failure and acute diverticulitis of the large intestine, which caused significant colonic perforations. These perforations resulted in sepsis and the presence of free air in his abdomen.

32. Hospital physicians also indicated that Mr. Stevens had developed toxic metabolic encephalopathy attributed to acute renal failure. This led him to suffer from delirium, periodic hallucinations, benign tremors, and diminished speech capabilities.

33. Upon his discharge from McLaren in mid-January 2014, hospital physicians recommended that Mr. Stevens receive hemodialysis three times a week and a follow-up colonoscopy to ascertain the nature and extent of his intestinal perforations.

## B. Transfer to Detroit Reentry Center

34. In late January 2014, MDOC transferred Mr. Stevens to the Detroit Reentry Center ("RRF") so that he could receive onsite dialysis. Throughout February and March 2014, Dr. Jayawardena and Dr. Hillyer declined to refer Mr. Stevens for a colonoscopy.

35. In late March 2014, Mr. Stevens began experiencing severe abdominal cramping and he observed blood in his stool. At this time, Dr. Jayawardena decided to refer Mr. Stevens for a colonoscopy.

36. On April 10, 2014, Mr. Stevens underwent a colonoscopy at McLaren. The examining physicians discovered ulcerative colitis throughout his entire colon. In light of the severity and extent of his condition, hospital physicians recommended that Mr. Stevens undergo colorectal surgery.

37. On April 16, 2014, Mr. Stevens underwent a total proctocolectomy at McLaren. Although hospital surgeons intended to preserve portions of Mr. Stevens's rectum and anus with reconstructive techniques, they discovered extensive ulcerative colitis throughout the colon, rectum, and anus during the procedure. Hospital surgeons also noted an abscess in the pelvis. As a result, they entirely removed Mr. Stevens's anus and rectum resulting in a permanent ileostomy.

38. In addition, diagnostic tests performed at McLaren indicated that Mr. Stevens's had developed a heart murmur.

39. Upon his discharge from McLaren in late April 2014, hospital physicians recommended that MDOC medical staff schedule Mr. Stevens for a follow-up visit with his colorectal surgeon, Mark W. Jones, D.O. However, when he returned to RRF, neither Dr. Jayawardena, Dr. Hillyer, nor HUM McCarthy scheduled him for this visit. Moreover, Dr. Jayawardena did not remove the sutures remaining from

the proctocolectomy until July 7, 2014, nearly three months after Mr. Stevens underwent the procedure.

40. By mid-June 2014, Mr. Stevens exhibited hyperkalemia, *i.e.*, abnormally high potassium levels. This condition required him to undergo inpatient hemodialysis at Detroit Medical Center ("DMC") and McLaren. Hospital physicians at McLaren eventually replaced Mr. Stevens's Ash catheter, which temporarily lowered his potassium levels.

41. Nonetheless, Mr. Stevens continued to suffer from hyperkalemia during his incarceration at RFF from July through early August 2014. Medical records from this time also indicate that Mr. Steven's suffered from Stage V renal failure.

42. During this period, Mr. Stevens again required inpatient hemodialysis at DMC where hospital physicians expressed concern that his hyperkalemia could substantially impair the functioning of his heart. Dr. Jayawardena also noted in Mr. Stevens's MDOC medical file that the "patient has a very high potassium level – at risk for cardiac arrest."

43. Nursing staff at RRF informed Mr. Stevens of the symptoms typically associated with hyperkalemia, including nausea, vomiting, and tiredness. They directed him to immediately report the onset of any of these symptoms to the facility's healthcare unit.

44. On August 2, 2014, Mr. Stevens could no longer receive dialysis because his Ash catheter port became dislodged. When he complained to dialysis technician Barbara "Doe", she declined to immediately refer him for a catheter port replacement. Instead, she informed Mr. Stevens that she would leave a reminder note for RRF nursing staff.

45. The following day, Mr. Stevens became seriously ill and he began vomiting in his cell.

46. At 1:00 P.M. on August 4, 2014, Mr. Stevens presented to nurse Awosika with continued nausea and vomiting. She noted in his medical file that "[p]atient was positive for dark brown emesis." Approximately a half hour later, nurse Rouleau reported that Mr. Stevens's blood pressure was significantly elevated at 157/64.

47. At 1:25 P.M., Dr. Jayawardena ordered a complete blood count ("CBC") to be sent to DMC for laboratory analysis.

48. At 2:30 P.M., Mr. Stevens's presented to ARUS White and Corrections Officers James and Caroton with persistent vomiting, headache, and numbness in his limbs, which are all typical symptoms of hyperkalemia. They instructed Mr. Stevens to return to his cell.

49. At approximately 3:00 P.M., Mr. Stevens reported to dialysis nurse Marshall. Nurse Marshall obtained Mr. Stevens's vital signs and informed him that they were stable. Although Mr. Stevens continued to show symptoms of hyperkalemia, nurse

Marshall directed Mr. Stevens to return to this cell without further medical intervention.

50. At 4:39 P.M., DMC faxed Mr. Stevens's CBC test results to RRF. The results showed that Mr. Stevens's potassium level exceeded 7 millimoles per liter of blood (normal potassium levels range from 3.6 to 5.2 millimoles per liter). Despite these alarming test results, and Mr. Stevens's heightened risk of cardiac arrest, neither Dr. Jayawardena, Dr. Hillyer, HUM McCarthy, nor any member of the RRF nursing staff ordered Mr. Stevens's to be immediately transported to a local hospital for emergency treatment.

51. Instead, Mr. Stevens remained in his cell and never received any medical treatment from 4:39 P.M. through approximately 6:30 P.M., when his fellow inmates eventually carried him to the RRF's healthcare unit.

52. At 7:05 P.M., nurse Rouleau reported that Mr. Stevens's blood pressure was critically high at 198/81. He was then transported by ambulance from RRF to DMC at approximately 7:30 P.M.

53. Mr. Stevens experienced cardiac arrest while in route to DMC and he was nonresponsive when he arrived there at 7:48 P.M. Emergency room physicians pronounced him dead at 8:23 P.M.

54. Thereafter, Warden Stewart, Deputy Warden Chapman, and Administrative Assistant Konieczki investigated the events surrounding Mr. Stevens's death. The

findings of this inquiry are currently unknown because they either failed to produce or preserve any records of the investigation.

55. Upon information and belief, none of the corrections, nursing, or medical staff at RRF were either disciplined or terminated because of their deliberate indifference to Mr. Stevens's serious medical condition.

### B. Ombudsmen Investigation

56. Throughout Mr. Stevens's incarceration with MDOC, Ms. Vannortwick continuously petitioned Ombudsman Keith Barber and Ombudsman Specialist Eric Mattson to investigate the level of medical care that Mr. Stevens's received at RRF.

57. On June 25, 2014, Barber and Mattson allegedly interviewed Mr. Stevens and HUM McCarthy at RRF. Addressing Mr. Stevens's hyperkalemia, Barber and Mattson reported that "[a]ccording to RRF healthcare, hyperkalemia is something that will come and go with a dialysis patient and Mr. Stevens does not have any heart condition."

58. In a letter to Mr. Stevens dated July 16, 2014, Barber and Mattson summarized the findings from their interviews at RRF, concluding that "[a]t this time, it appears health care at RRF is giving you appropriate access to care."

59. Mr. Stevens suffered a fatal heart attack resulting from hyperkalemia nearly two weeks later.

### COUNT I – VIOLATION OF 42 U.S.C. § 1983
### (Eighth Amendment - Cruel and Unusual Punishment)

*Against Defendants Awosika, Rouleau, McCarthy, Marshall, and Doe*
*(the "Nurse Defendants")*

60. Plaintiff restates and incorporates by reference each and every allegation set forth above.

61. The Nurse Defendants knew that Mr. Stevens suffered from Stage V renal failure and hyperkalemia during his incarceration at RRF.  They also knew that these conditions present a heightened risk of cardiac arrest.

62. While Mr. Stevens exhibited typical symptoms of advanced hyperkalemia on August 3 through 4, 2014, the Nurse Defendants ignored these symptoms and failed to recommend that Dr. Jayawardena or Dr. Hillyer immediately refer him to a local hospital for emergency treatment.

63. In view of the foregoing, the Nurse Defendants exhibited deliberate indifference to Mr. Stevens's serious medical condition in violation of his right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment.

### COUNT II – VIOLATION OF 42 U.S.C. § 1983
### (Eighth Amendment - Cruel and Unusual Punishment)
*Against Defendants Jayawardena and Hillyer*
*(the "Physician Defendants")*

64. Plaintiff restates and incorporates by reference each and every allegation set forth above.

65. The Physician Defendants knew that Mr. Stevens suffered from Stage V renal failure and hyperkalemia during his incarceration at RRF. They also knew that these conditions present a heightened risk of cardiac arrest.

66. While Mr. Stevens exhibited typical symptoms of advanced hyperkalemia on August 3 through 4, 2014, the Physician Defendants ignored these symptoms and failed to immediately refer him to a local hospital for emergency treatment.

67. Accordingly, the Physician Defendants exhibited deliberate indifference to Mr. Stevens's serious medical condition in violation of his right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment.

### COUNT III – VIOLATION OF 42 U.S.C. § 1983
### (Eighth Amendment - Cruel and Unusual Punishment)

*Against Defendants White, Caroton, and James*
*(the "Corrections Defendants")*

68. Plaintiff restates and incorporates by reference each and every allegation set forth above.

69. The Corrections Defendants knew that Mr. Stevens suffered from Stage V renal failure and hyperkalemia during his incarceration at RRF. They were also aware that these conditions present a heightened risk of cardiac arrest.

70. While Mr. Stevens exhibited typical symptoms of advanced hyperkalemia on August 3 through 4, 2014, the Corrections Defendants ignored these symptoms and failed to immediately transport him to RRF's healthcare unit.

71. Consequently, the Corrections Defendants exhibited deliberate indifference to Mr. Stevens's serious medical condition in violation of his right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment.

### COUNT IV – VIOLATION OF 42 U.S.C. § 1983
### (Eighth Amendment - Cruel and Unusual Punishment – Failure to Intervene)

*Against Defendants Barber and Mattson (the "Ombudsmen Defendants")*

72. Plaintiff restates and incorporates by reference each and every allegation set forth above.

73. The Ombudsmen Defendants are tasked with the responsibility of investigating MDOC activities that are alleged to be contrary to law or department policy.

74. The Ombudsmen Defendants conducted a cursory investigation into the constitutionally deficient medical care that Mr. Stevens received at RRF. Among other things, they failed to (1) independently review his medical records, and (2) interview any of Mr. Stevens's physicians (both at RRF, other MDOC medical facilities, or non-MDOC medical facilities).

75. An appropriately thorough inquiry would have uncovered an extensive pattern of deliberate indifference to Mr. Stevens's serious medical needs and would have led to significant improvements in his medical care.

76. Therefore, the Ombudsmen Defendants failed to properly investigate, intervene, and correct the constitutionally deficient level of medical care that resulted in Mr. Stevens's death.

## COUNT IV – VIOLATION OF 42 U.S.C. § 1983
### (Eighth Amendment - Cruel and Unusual Punishment – Conspiracy)

*Against All the Defendants*

77. Plaintiff restates and incorporates by reference each and every allegation set forth above.

78. Defendants Stewart, Chapman, and Konieczki (the "Administration Defendants") investigated the events surrounding Mr. Stevens's death. The findings of this inquiry are currently unknown because the Administration Defendants either failed to produce or preserve any records of the investigation.

79. Upon information and belief, none of the corrections, nursing, or medical staff at RRF were either disciplined or terminated because of their deliberate indifference to Mr. Stevens's serious medical condition.

80. In view of the foregoing, the Administration Defendants conspired with the remaining Defendants to conceal the extensive pattern of constitutionally deficient medical care that caused Mr. Stevens's death.

## COUNT V – WRONGFUL DEATH
## (Mich. Comp. Laws § 600.2922)

*Against All the Defendants*

81. Plaintiffs restate and incorporate by reference each and every allegation set forth above.

82. Defendants' wrongful conduct caused Mr. Stevens to sustain injuries resulting in death.

83. The Estate of Claude Stevens is entitled to an award of fair and equitable damages, including, but not limited to, reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for Mr. Stevens's pain and suffering, while conscious, during the intervening period between the time of his injuries and his death; and damages for the loss of Mr. Stevens's financial support, society, and companionship; as well as any other damages cognizable under law.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Enter judgment against all Defendants;

b. Enter a declaratory judgment that Defendants violated Mr. Stevens's right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment;

c. Award Plaintiffs' costs and attorney fees pursuant to 42 U.S.C. § 1988;

    d. Award the Estate of Claude Stevens fair and equitable damages, including, but not limited to, reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for Mr. Stevens's pain and suffering, while conscious, during the intervening period between the time of his injuries and his death; and damages for the loss of Mr. Stevens's financial support, society, and companionship; as well as any other damages cognizable under law; and

    e. Grant such other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury on all matters before the Court to the extent allowed by law.

Respectfully submitted,

EXCOLO LAW, PLLC

By: */s/Solomon M. Radner*
    Solomon M. Radner (P73653)
    Attorney for Plaintiff
    26700 Lahser Road, Suite 401
    Southfield, MI 48033
    (866) 939-2656

Dated: August 2, 2017     sradner@excololaw.com