UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERRY L. VANNORTWICK,
as the Personal Representative of
the Estate of Clause Stevens,

          Plaintiff,          Civil Case No. 17-12507
                                     Honorable Linda V. Parker
v.

ANTHONY H. STEWART, et al.,

          Defendants.
_____/

## OPINION AND ORDER

This lawsuit, brought pursuant to 42 U.S.C. § 1983, arises from the death of

Claude Stevens on August 4, 2014, while a Michigan Department of Corrections

("MDOC") prisoner.  Plaintiff Sherry L. Vannortwick, the Personal Representative

of Mr. Stevens' estate, claims Defendants were deliberately indifferent to Mr.

Stevens' serious medical needs in violation of his Eighth Amendment rights.  At

this time, the following individuals remain as defendants in this action: Vindhya S.

Jayawardena, M.D.; Francis K. Awosika, N.P.; Christina White; Sheila James; and

Barbara Boles, R.N.[1]  The matter is presently before the Court on Defendants'

_____

[1] Nurse Boles is pro se.  Plaintiff and the remaining defendants are represented by counsel.

motions for summary judgment. The motions have been fully briefed, and the Court held a hearing with respect to the motions on March 10, 2020.

## I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is

insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Factual Background

In early January 2014, Mr. Stevens was transferred to MDOC's Ryan Road Correctional Facility, now known as the Detroit Reentry Center ("DRC"), after receiving inpatient hospital care and renal dialysis for Stage V end-stage renal disease.  Mr. Stevens also had a history of hypertension, gastroesophageal reflux disease (GERD), hyperlipidemia, anemia, microperforation of diverticular disease, osteopenia, Vitamin D deficiency, and deconditioning.  (Medical Record at 9, ECF No. 142-1 at Pg ID 2122.)  All MDOC prisoners receiving dialysis are incarcerated at DRC in a single housing unit.  MDOC contracts with Corizon Health, Inc. ("Corizon") to provide healthcare to its inmates.  Through a subcontract with Corizon, CharDonnay Dialysis Inc. ("CharDonnay") provides dialysis treatments and services to MDOC prisoners.

Defendants Vindhya Jayawardena, M.D. ("Dr. Jayawardena") and Francis K. Awosika, NP ("Nurse Awosika"), are employed by Corizon, to provide healthcare to inmates at the prison.  Defendant Christine White is an MDOC employee, who worked as an assistant residential unit supervisor ("ARUS") in the housing unit where Mr. Stevens was assigned ("ARUS White").  Defendant Sheila

James ("CO James") also is an MDOC employee, working as a corrections officer in the DRC unit where Mr. Stevens was incarcerated. Defendant Barbara Boles, RN ("Nurse Boles"), worked for CharDonnay at DRC. She is now retired.

On January 13, 2014, Dr. Jayawardena met with Mr. Stevens for his first healthcare visit upon arriving at DRC. (Medical Records at 12-16, ECF No. 143 at Pg ID 2215-2219.) Dr. Jayawardena placed orders for Mr. Stevens' medications, ordered blood work, and requested his labs and hospital discharge summary. (*Id*.)

On February 11, 2014, on recommendation from McLaren, Dr. Jayawardena sent a consultation request ("407") for Mr. Stevens to have a barium enema as an alternative to a colonoscopy. (*Id.* at 3, 19-20, Pg ID 2207, 2223-24.) Dr. Jayawardena noted that Mr. Stevens had a perforated colon due to diverticulitis. The request was approved. (*Id.*)

On February 20, 2014, Dr. Jayawardena met with Mr. Stevens following complaints of fluid overload, restless leg, and diverticulitis. (*Id.* at 21-24, Pg ID 2225-28.) Dr. Jayawardena noted that Mr. Stevens had been dialyzed the day before and would be dialyzed the following morning. (*Id.*) She shared Mr. Stevens' condition with Robert Hillyer, M.D., a nephrologist who worked as an independent contractor for CharDonnay in the prison's dialysis unit. (*Id.*) Dr. Jayawardena also ordered blood work. (*Id*).

On February 22, 2014, the lab telephoned DRC's healthcare unit with the results of Mr. Stevens' blood work, which indicated critical values unrelated to potassium. (*Id.* at 25, Pg ID 2228.) Dr. Jayawardena was informed, and she ordered repeat blood work "stat." (*Id.*) When blood work is ordered "stat" at the facility, it is considered to be urgent and is sent to the Detroit Medical Center ("DMC") lab at Detroit Receiving Hospital ("DRH"). (Awosika Dep. at 30, ECF No. 142-2 at Pg ID 1653.) The lab immediately comes to pick up the specimen and then telephones the healthcare unit at the prison with the results, while also sending the results via fax. (*Id.* at 30-31, Pg ID 1653-54.) Non-stat lab work is sent to another lab, Garzia. (*Id.* at 30, Pg ID 1653.) Dr. Jayawardena completed a chart review on February 24, 2014. (Med. Record at 26, ECF No. 143 at Pg ID 2229-30.)

On March 6, 2014, Mr. Stevens returned from DMC Harper Hospital after undergoing his barium enema procedure. (*Id.* at 28, Pg ID 2231.) The officer who transported Mr. Stevens back to the facility did not wait for the hospital documentation and copies were requested. (*Id.*)

On March 10, 2014, Dr. Jayawardena evaluated Mr. Stevens and reviewed the results of the barium enema procedure based on which it was recommended that Mr. Stevens undergo a colonoscopy or CT scan. (*Id.* at 29-31, 146-47, Pg ID 2232-34, 2349-50.) Dr. Jayawardena submitted a 407 request for a consultation

with a colorectal surgeon per the specialist's recommendations due to the possibility of malignancy, a 407 for a consultation with vascular surgery for a permanent access catheter and access placement from vascular surgery, and a 407 for a bilateral venogram for determination of blood flow. Utilization management approved all four (4) consultation requests. (*Id.* at 29-40, Pg ID 2232-43.)

Following Mr. Stevens' consult with colorectal surgery, it was recommended that he undergo a colonoscopy. (*Id.* at 41-42, Pg ID 2244-45.) Dr. Jayawardena submitted a 407 request for a colonoscopy and utilization management approved it. (*Id.*) A colonoscopy was scheduled for March 30, 2014. (*Id*. at 44, Pg ID 2247.)

On March 26, 2014, Mr. Stevens presented to the healthcare unit with a one-day history of abdominal cramps and bloody stool, which he attributed to his diverticulitis. (*Id.* at 43-45, Pg ID 2246-48.) Mr. Stevens indicated that his stomach pain worsened with eating. (*Id.*) Nurse Awosika evaluated Mr. Stevens and administered a fecal occult blood test ("FOBT"), for which the result was positive. (*Id.*) Nurse Awosika ordered stat blood work, antibiotics, and Tylenol for pain management. (*Id.*) Mr. Stevens' colonoscopy was scheduled for that week, and Nurse Awosika planned to follow up when the results were available. (*Id.*)

On March 27, 2014, Mr. Stevens was scheduled to have a surgical permanent access placement done at Southeast Hospital; however, because he had an infection and was taking antibiotics, the surgery had to be postponed and rescheduled. (*Id.* at 46-47, Pg ID 2249-50.) On that date, Dr. Jayawardena submitted paperwork to reschedule Mr. Stevens' procedure. (*Id*. at 47, Pg ID 2250.)

On March 28, 2014, Dr. Jayawardena updated Mr. Stevens' chart noting that his colonoscopy had been postponed and would be rescheduled after completion of oral antibiotics. (*Id.* at 48-49, Pg ID 2251-52.) It also was noted that Mr. Stevens refused his dialysis treatment that day at its scheduled time, but then later requested dialysis after being asked to sign a right of refusal. (*Id.* at 49, Pg ID 2252.) The record reflects that the dialysis center was closing when Mr. Stevens decided to go ahead with his treatment, and he could not be dialyzed. (*Id.*) Dr. Jayawardena ordered stat potassium blood work and gave a "sign out" to another doctor to follow up with the results.[2] (*Id.*) Dr. Jayawardena also instructed one of the nurses to contact the dialysis center in the morning to see if Mr. Stevens could receive a "short run." (*Id.*) Additionally, Dr. Jayawardena requested a mental health evaluation to determine whether Mr. Stevens understood the consequences

---

[2] By writing "sign out," the medical provider is recording that he or she has brought the matter to another medical provider's attention. (*See* Awosika Dep. at 56, ECF No. 142-2 at Pg ID 1679.)

of refusing hemodialysis and that it is life threatening to do so. (*Id.* at 49, 50, Pg ID 2252, 2253.)

On April 6, 2014, a healthcare nurse responded to Mr. Stevens' written request ("kite") for complaints of blood in stool, cramps, bloating, and history of diverticulitis, and scheduled a nurse sick call visit. (*Id.* at 51, Pg ID 2254.) Mr. Stevens was scheduled to be seen by Dr. Jayawardena on April 8, 2014.

On that date, Mr. Stevens complained of blood in his urine and associated pain. (*Id.* at 52-54, Pg ID 2255-57.) Dr. Jayawardena examined Mr. Stevens, reviewed the results of his past blood work and ordered stat blood work, indicating that Mr. Stevens should be sent to the emergency room if his white blood count was high or his hemoglobin was low. (*Id.*) Dr. Jayawardena also indicated that she would call surgery to advance the appointment for Mr. Stevens' colonoscopy or consider direct admit. (*Id.*)

DMC called with the results of Mr. Stevens' lab work at 12:00 p.m. the following day, April 9, 2014. (*Id.* at 55, Pg ID 2258.) Mr. Stevens' medical records reflect a critically high creatinine level at 6.21, as well as an elevated hemoglobin level. (*Id.*) A chart update by Dr. Jayawardena on the same date reflects that she spoke with McLaren hospital and the hospital accepted Mr. Stevens for admission. (*Id.* at 56, Pg ID 2259.) A physician in surgery would be

consulted to perform a colonoscopy. (*Id.*) Dr. Jayawardena noted that Mr. Stevens received dialysis that day. (*Id.*)

While hospitalized at McLaren, Mr. Stevens had an urgent IP C-Scope, which Dr. Jayawardena requested via a 407 consult request. (*Id.* at 58, Pg ID 2261.) The scope revealed abnormalities requiring a total colectomy and diverting ileostomy on April 16, 2014. (*Id.* at 59-63, Pg ID 2262-66.) Mr. Stevens remained at McLaren for his recovery, until he was discharged to the Duane Waters Health Center ("DWH") on April 30, 2014. (*Id.* 63-74, Pg ID 2266-77.)

On that date, Mr. Stevens had an infection in his dialysis port, resulting in his transfer to the DWH emergency room for placement of a new ASH catheter. (*Id.* at 71, 75, Pg ID 2274, 2278.) Mr. Stevens received dialysis on that date and then left emergency. (*Id.* at 75, Pg ID 2278.) He was then admitted to DWH as an inpatient for further observation and recovery care following his colectomy and abdominoperineal resection. (*Id.* at 75-77, Pg ID 2278-80.) Mr. Stevens' care plan included pain management following surgery, an antibiotic regimen, and monitoring of his surgical incision site for signs of infection. (*Id.*)

On May 8, 2014, Mr. Stevens had to return to McLaren because his hemodialysis catheter was clotted off and could not be accessed. (*Id.* at 81, Pg ID 2284.) Eventually, on May 28, 2014, Mr. Stevens was transferred to DRC. (*Id.* 82-83, Pg ID 2285-86). Mr. Stevens' medical records reflect that during this

period he was prescribed Kayexalate three times daily to lower his potassium levels. (ECF Nos. 157-10, 157-13.) On May 30, 2014, a physician at DRC saw Mr. Stevens for follow-up. (Med. Record at 84-86, ECF No. 143 at Pg ID 2287-89.) The treatment plan was to monitor Mr. Stevens' clinically stable symptoms following his proctocolectomy and to continue dialysis. (*Id.* at 86, Pg ID 2289.)

On June 11, 2014, Mr. Stevens sent a kite complaining of feeling lightheaded and wobbly, and a nurse visit was scheduled. (*Id.* at 87, Pg ID 2290.) That same day, Dr. Jayawardena sent a 407 for a vein mapping procedure with vascular surgery so access placement could be determined before placement of a permcath, which utilization management approved. (*Id.* at 90, Pg ID 2293.) The following day, June 12, 2014, Dr. Jayawardena noted that she had discussed Mr. Stevens' persistently high potassium levels with Dr. Hillyer and it was determined that Mr. Stevens needed his permanent catheter replaced. (*Id.* at 92, Pg ID 2295.) Dr. Jayawardena further noted that blood work would be drawn and that Dr. Hillyer would address Mr. Stevens' post proctoclectomy high hemoglobin level. (*Id.*)

Dr. Hillyer also made a progress note on June 12, 2014, indicating that Mr. Stevens had poor catheter function, which contributed to him having high potassium, and that permanent access would solve the problem. (*Id.* at 93, Pg ID 2296.) Dr. Hillyer's notes reflect that Mr. Stevens was receiving the new catheter

10

that day and that his potassium would be checked stat. (*Id*.) Dr. Jayawardena submitted a 407 request for Mr. Stevens to have a permcath replacement and utilization management approved it. (*Id.* at 94-95, Pg ID 2297-98.)

Later in the day on June 12, 2014, Mr. Stevens returned from Southeast Surgical where he was supposed to have the vein mapping procedure and catheter replacement done. (*Id.* at 96, Pg ID 2299.) Because Mr. Stevens had eaten lunch, the specialist was unable to perform the procedure. (*Id.*) Dr. Jayawardena ordered stat lab blood work to DMC. (*Id.*) Dr. Jayawardena "signed out" to Dr. Jenkins after ordering stat labs and noted the need for rescheduling of the procedure.

Almost seven hours later, a healthcare nurse made an entry in Mr. Stevens' medical record noting that his lab results revealed a potassium level of 7.0. (*Id.* at 100, Pg ID 2303.) The nurse notified one of the physicians, who ordered Mr. Stevens transported to DRH. (*Id.*)

Medical staff at DRH noted that Mr. Stevens was dialyzed on June 12 and 13, but continued to experience high potassium levels, and that there was a concern his catheter may be recirculating and not functioning appropriately. (DRH Record, ECF No. 145 at Pg ID 2357-66.) Mr. Stevens was given a dose of Kayexalate, had repeat lab studies, and a 12-lead EKG. (*Id.*) He then was deemed stable and transferred to McLaren for catheter replacement. (*Id.* at Pg ID 2367; MDOC Med. Record at 104, ECF No. 143 at Pg ID 2307.)

Notes by Dr. Jayawardena on June 13, 2014, reflect that Mr. Stevens was sent back to DRC without having the catheter procedure because he had not fasted. (MDOC Med. Record at 104, ECF No. 143 at Pg ID 2307.) Dr. Jayawardena spoke with Dr. Hillyer, who reported that Mr. Stevens was getting dialysis but the catheter was again recirculating and that his potassium level may still be high. (*Id.*) Mr. Stevens' blood was drawn at 11:34 a.m. to check his potassium level. (*Id.* at 102, Pg ID 2305.) Dr. Hillyer requested that Mr. Stevens be sent back to DRH for treatment and to have his catheter exchanged on an outpatient basis once his potassium level was brought down. (*Id.* at 104, Pg ID 2307.) Dr. Hillyer contacted the emergency room and dialysis unit at DRH and instructed that Mr. Stevens not be discharged. (*Id.*) A 4:00 p.m. entry in the medical record reflects that DMC called with stat lab results, reflecting a potassium level of 7.00, and that Dr. Jayawardena was notified. (*Id.* at 106, Pg ID 2309.)

Per Dr. Hillyer's order, Mr. Stevens was not discharged from DRH. On June 16, 2014, he was transferred to McLaren. (*Id.* at 107, Pg ID 2310.) The following day, he consented to having his current Ash catheter replaced with a new Ash catheter, and this procedure was performed on June 17, 2014. (*Id.* at 108-09, Pg ID 2311-12.)

On June 23, 2014, Dr. Jayawardena again requested via 407 paperwork for Mr. Stevens to have a permanent access catheter placed. (*Id.* at 110, Pg ID 2313.)

Dr. Jayawardena submitted a 407 request for Mr. Stevens to also have a follow-up with the colorectal surgeon.  (*Id.* at 112, Pg ID 2315.)  Both requests were approved by utilization management.  (*Id.* at 110-13, Pg ID 2313-16.)

On July 8, 2014, Mr. Stevens was sent to McLaren for permanent access placement; however, he had an elevated potassium level of 8.2 due to his recirculating permcath.  (*Id.* at 114, Pg ID 2317.)  Mr. Stevens was then transferred to Harper Hospital Emergency Room to stabilize his potassium.  (*Id.*)  On July 9, 2014, Mr. Stevens was sent back to McLaren with his potassium level reduced to 5.7 and was admitted to the surgical unit.  (*Id.*)  Following consultation with vascular surgery, the procedure was scheduled for on or about July 15, 2014.  (*Id.* at 114-16, Pg ID 2317-19.)

On July 14, 2014, Dr. Jayawardena sent a 407 request for removal and replacement of Mr. Stevens' permcath.  (*Id.* at 117-18, Pg ID 2320-21.)  Utilization management approved this request the following day.  (*Id.*)  On July 17, 2014, Mr. Stevens was sent to South East Surgical for replacement of his permcath.  (*Id.* at 120, Pg ID 2323.)  His potassium level was high again, at 7.4., and Mr. Stevens admitted that he had consumed a carton of fruit punch, which contained orange juice and potassium benzoate as a preservative.  (*Id.*)  Dr. Jayawardena requested that Mr. Stevens be sent to the emergency room at DRH, due to his elevated

potassium level, which posed a risk for cardiac arrest. (*Id*.) She also made a note to contact the dietician to address Mr. Stevens' diet. (*Id*.)

On July 18, 2014, a Friday, Dr. Jayawardena ordered potassium level stat labs for Sunday, and signed out to NP Awosika. (*Id*. at 121-122, Pg ID 2324-25.) A nurse drew Mr. Stevens' blood work on July 20, and it was sent to DMC labs. (*Id*. at 123, Pg ID 2326.) At 11:05 a.m., the lab called reporting a critically high potassium level of 6.5. (*Id*. at 124, Pg ID 2327.) The nurse called NP Awosika, who ordered Kayexelate. (*Id*.) Mr. Stevens received Kayexelate and was instructed to notify healthcare immediately with complaints (including nausea, feeling tired, any difficulty with ambulation, or any tingling sensations). (*Id*.) The nurse observed that Mr. Stevens was able to ambulate to healthcare without difficulty, that he did not appear distressed, and verbalized no complaints. (*Id.*)

On July 29, 2014, Dr. Jayawardena documented that Mr. Stevens had received his new permcath from Harper Interventional Radiology. (*Id.* at 126, Pg ID 2329.) Dr. Jayawardena explained at her deposition in this case that Mr. Stevens' previous episodes of high potassium levels—that is, hyperkalemia—were believed to be due to nonfunctioning catheters. (Jayawardena Dep. at 94-95, ECF No. 142-3 at Pg ID 1848-49; *see also* Lacy Dep. at 133-34, ECF No. 166 at Pg ID 3712-13.) On July 29, Dr. Jayawardena instructed Mr. Stevens on the avoidance of foods containing high potassium and phosphorous, provided illustrated

instructions, and advised him to eat from the diet line instead of the regular line.[3]
(Med. Records at 128, ECF No. 143 at Pg ID 2331.)  Dr. Jayawardena noted that
labs would be repeated in the morning.  (*Id.*)

On July 31, 2014, Dr. Jayawardena made a note in Mr. Stevens' medical
records indicating that she had reviewed Mr. Stevens' post-dialysis potassium and
it was normal and his hemoglobin level had improved.  (*Id.* at 129, Pg ID 2332.)

On Saturday, August 2, 2014, Mr. Stephens' catheter became dislodged and
he allegedly reported this to someone in the dialysis unit.  No medical record (in
the MDOC or CharDonnay records) reflects that this happened.  Dr. Jayawardena
testified that when she asked one of the dialysis technicians what happened to Mr.
Stevens' catheter, the tech told her to ask "Barb."  (Jayawardena Dep. at 92, ECF
No. 142-3 at Pg ID 1846.)  When Dr. Jayawardena spoke with "Barb," she said
Mr. Stevens came and told her on Saturday that he lost the catheter.  (*Id.*)

Dennis Ray Frick, a former MDOC inmate who also receives dialysis, wrote
a letter detailing the events preceding Mr. Stevens' death.  (ECF No. 167-2.)  In the
letter, Mr. Frick indicates that he told Mr. Stevens to go to "medical" after his
catheter came out.  (*Id.*)  Mr. Frick writes that medical put gauze over [the area
where the catheter was], and that Mr. Stevens then went to see a nurse in the

---

[3] A Nutritional Assessment in Mr. Stevens' medical records reflects that he was
instructed on nutritional principles associated with a renal diet in January 2014.
(Med. Record at 130, ECF No. 143 at Pg ID 2332.)

dialysis unit.  (*Id.*)  Mr. Frick then writes that Mr. Stevens saw Nurse Barb, who said she would leave a note to have it (i.e., the catheter) taken care of on Monday. (*Id.*)  At his deposition in this matter, Mr. Frick testified that Mr. Stevens said he saw Barb, but did not indicate if he talked to her.  (Frick Dep. at 14, ECF No. 167-3 at Pg ID 3820.)

Mr. Stevens was not Nurse Boles' patient.  (Boles Dep. at 19, ECF No. 167-4 at Pg ID 3870.)  She worked Tuesdays, Thursdays, and Saturdays (*id.*), while Mr. Stevens received dialysis on Mondays, Wednesdays, and Fridays.  (Marshall Dep. at 35, ECF No. 142-7 at Pg ID 1931.)  Nurse Boles does not remember Mr. Stevens coming to her on Saturday, August 2, and reporting that his catheter had fallen out.  (*Id.* at 22, Pg ID 3872.)  If he had, she testified she would have followed CharDonnay's protocol, which required her to call the doctor and have Mr. Stevens' blood drawn.  (*Id.*)  She would not have told him that he had to wait until Monday.  (*Id.*)  Nurse Boles contends that Mr. Frick's statements constitute inadmissible hearsay.

At around 7 or 8 o'clock a.m. on Monday, August 4, 2014, inmates notified the dialysis unit manager, Larry Marshall, RN, that Mr. Stevens' catheter had been dislodged.  (Marshall Dep. at 21, ECF No. 142-7 at Pg ID 1917.)  Mr. Stevens had

received dialysis on the previous Friday.[4]  (*Id.* Ex. A, ECF No. 142-7 at Pg ID 2025.)  However, he could not receive dialysis on August 4 due to the dislodged catheter.  (Marshall Dep. Ex. 3, ECF No. 142-7 at Pg ID 2026.)

Nurse Marshall met with Mr. Stevens, who reported that the catheter fell out over the weekend.  (*Id.* at 23, 27, 33, Pg ID 1919, 1923, 1929.)  Nurse Marshall evaluated Mr. Stevens by taking his vitals and ordered blood work stat.  (*Id.* at 32-33, 100, 1927.)  Nurse Marshall reported that Mr. Stevens' vitals were stable, his lungs were clear, and he had no arrhythmia or slurred speech.  (*Id.* at 34, Pg ID 1930.)  He further reported that Mr. Stevens was awake, alert, and oriented, had walked to the dialysis unit, and was able to comprehend and follow orders.  (*Id.*)

Nurse Marshall explained at his deposition that standing protocol requires blood work to assess a patient's condition if the patient misses a dialysis treatment or cannot receive his dialysis.  (*Id.* at 31, Pg ID 1927.)  It is not uncommon for patients to miss their dialysis, however, and CharDonnay does not view two missed appointments as critical.  (Jayawardena Dep. at 49  ECF No. 142-3 at Pg ID 1803; *see also* Hillyer Dep. at ECF No. 157-25 at Pg ID 3449 (explaining that it happens frequently that dialysis treatments are missed and 5-10% can be missed.)

---

[4] The dialysis unit utilizes paper charting, whereas Corizon maintains a computer record.  (Marshall Dep. at ECF No. 142-7 at Pg ID 1935-96.)  A Corizon employee in the healthcare unit therefore does not immediately have a CharDonnay staff member's chart entries for a patient, unless the Corizon employee went to the dialysis unit and physically looked at the chart.  (*Id.*)

Still, hyperkalemia is suspected when a patient is not dialyzing. (Jayawardena Dep. at 22, ECF No. 142-3 at Pg ID 1776.) But you cannot assess whether a patient is suffering from hyperkalemia without doing blood work because the condition has nonspecific symptoms. (*Id.* at 23, Pg ID 1777; *see also* Marshall Dep. at 90, ECF No. 142-7 at Pg ID 1986 (explaining that you cannot determine from a patient's physical appearance that he or she is suffering from hyperkalemia).) If a patient demonstrates any symptoms, they may be neuromuscular like paresthesia, numbness, tingling, or muscle weakness. (Jayawardena Dep. at 23, ECF No. 142-3 at 1777; Hillyer Dep. at 8, ECF No. 157-25 at Pg ID 3442.) Vomiting is not a typical symptom of hyperkalemia. (Hillyer Dep. at 46, ECF No. 157-25 at Pg ID 3480.)

Nurse Marshall arranged for Mr. Stevens to have his catheter port replaced at 8:00 a.m. the following morning at Harper Hospital, where he would also receive dialysis. (Marshall Dep. at 44, ECF No. 142-7 at Pg ID 1940.) When asked at his deposition why the catheter was not replaced on Monday August 4, Nurse Marshall explained that it is a specialty procedure, an invasive procedure, and a patient cannot simply be sent to the hospital for it to be performed. (*Id.* at 44-45, Pg ID 1940-41.) Blood work is done to check the patient's condition and if the patient's potassium is elevated, the patient is treated with Kayexalate or, if the potassium level is critically high, the patient is immediately sent to the hospital.

(*Id.* at 45-46, Pg ID 1941-42.)  Kayexalate is not administered as a regular preventative medication, however, as it causes diarrhea and can run the risk of bowel toxicity.  (Hillyer Dep. at 31, ECF No. 157-25 at Pg ID 3465.)

Nurse Marshall informed Dr. Jayawardena that Mr. Stevens' catheter had dislodged, as Dr. Jayawardena had to submit the 407 paperwork to have the procedure approved.  (Marshall Dep. at 88, 100, ECF No. 142-7 at Pg ID 1984, 1996.)  At 10:42 a.m., Dr. Jayawardena completed the 407 paperwork, which utilization management approved that day.  (Med. Record at 131-32, 137, ECF No. 143 at Pg ID 2334-35, 2340.)  Dr. Jayawardena also requested to see Mr. Stevens to assess his condition, specifically to check him for fluid overload (e.g. shortness of breath or inability to breath, a low pulse ox, or abnormal swelling).  (Jayawardena Dep. at 22, ECF No. 142-3 at Pg ID 1776.)

At around noon on August 4, 2014, Dr. Jayawardena saw Mr. Stevens in the healthcare unit.  (*Id.*)  Dr. Jayawardena testified that Mr. Stevens' condition was stable and he appeared normal; he was standing and talking to her.  (*Id.* at 50, Pg ID 1804.)  Dr. Jayawardena recorded that Mr. Stevens' chief complaint was "burping."  (Med. Record at 134, ECF No. 143 at Pg ID 2337.)  Mr. Stevens reported that he had eaten rice with shredded beef on Saturday and had since experienced abdominal bloating, nausea, and felt sick.  (*Id.*)  Dr. Jayawardena noted during her deposition that Mr. Stevens had a lot of problems with

gastroesphageal reflux disease (GERD) going back to 2013.  (Jayawardena Dep. at 51, Pg ID 1805.)  She prescribed Zantac and ordered stat blood work.  (Med. Record at 134-35, ECF No. 143 at Pg ID 2337-38.)  Dr. Jayawardena recorded that a "sign out" was given to Nurse Awosika (*id*.), which meant she verbally and in writing informed him that Mr. Stevens was not dialyzed, that a new catheter placement was scheduled for the next day, and that stat labs were ordered and to check them and take action as appropriate.  (Jayawardena Dep. at 68-69, ECF No. 142-3 at Pg ID 1822-23.)

Otha Jordan, who shared a cell with Mr. Stevens on August 4, 2014, wrote a contemporaneous note about Mr. Stevens' condition and treatment on that date.  (Jordan Dep. at 13, ECF No. 142-13 at Pg ID 2144.)  Mr. Jordan referred to the note to refresh his recollection regarding the events on August 4, 2014, during his deposition in this matter.  (*Id*. at 13-15, Pg ID 2144-46.)

According to Mr. Jordan, after Mr. Stephens started vomiting on August 4, 2014, Mr. Stephens approached ARUS White.  (Jordan Dep. at 16, ECF No. 142-13 at Pg ID 2147.)  Mr. Jordan testified that he heard ARUS White tell Mr. Stephens to go back to his cell, that he was not going to health care, and that she was "tired of [him]."  (*Id.* at 15, Pg ID 2146.)

ARUS White testified that she left the housing unit between 2:30 and 3:00 p.m. on August 4, 2014, and that Mr. Stevens never approached her and asked to

go to the medical unit.  (White Dep. at 23, ECF No. 139-2 at Pg ID 1459.)

According to ARUS White, Mr. Stevens approached her as she was leaving the

unit and said his stomach was hurting.  (*Id*.)  That is all he said. (*Id*.)  ARUS White

testified that she turned to CO James, who was at the podium, and told CO James

that she needs to call healthcare and send Mr. Stevens over.  (*Id*.)  ARUS White

believes that she also told Mr. Stevens to lie down.  (*Id*. at 32, Pg ID 1461.)  ARUS

White then left for the day, and did not know whether CO James in fact called

healthcare.  (*Id*. at 30, Pg ID 1459.)

According to ARUS White, she did not know that Mr. Stevens' catheter had

become dislodged, that he had not had his regular dialysis treatment that day, or

that he had been vomiting.  (*Id*. at 32-33, 54, Pg ID 1461, 1467.)  She was aware

that he had been to healthcare earlier.  (*Id.*)

Mr. Ortha testified that Mr. Stevens was fine in the morning on August 4,

but that he started to not feel well at lunchtime.  (Ortha Dep. at 48-49, ECF No.

142-13 at Pg ID at 2179-80.)  According to Mr. Ortha, Mr. Stevens' symptoms

progressed quite a bit by 2:30 p.m, and at approximately 4:30 p.m., he began

regurgitating something that looked like feces.  (*Id.* at 17, Pg ID 2148.)  This was

during the time when the officers perform the headcount.  (*Id*.)  Mr. Ortha became

alarmed and tried to get help from officers, who told him to go back to his cell and

talk to them when the count was finished.  (*Id*.)

As soon as the count cleared, Mr. Ortha went to the unit desk and spoke with CO James. (*Id.*) He told CO James that Mr. Stevens needed to go to healthcare immediately, that he had been regurgitating something that looked like feces, and that he had been throwing up violently. (*Id.*) Mr. Otha reminded CO James that Mr. Stevens had a colostomy bag. (*Id.*)

According to Mr. Otha, he continued to approach the housing unit desk for help, but the officers told him to not come up any more as they were aware of the situation and to worry about himself. (*Id.* at 18, Pg ID 2149.) Mr. Otha talked to CO James continuously between 4:30 p.m. and approximately 7:00 p.m., when Mr. James finally went to healthcare. (*Id.*) Mr. Frick also approached CO James about Mr. Stevens not feeling right and needing to go to healthcare. (Frick Dep. at 18, ECF No. 167-3 at Pg ID 3824.) At approximately 7:00 p.m., inmates decided to take Mr. Stevens to healthcare, regardless of what the guards were saying, and they put him in a wheelchair to do so. (Ortha Dep. at 19, ECF No. 142-13 at Pg ID 2150.) It was only then that healthcare was called and Mr. Stevens was sent over. (*Id.*) According to Mr. Otha, by this point, Mr. Stevens had become almost non-responsive and was not able to stand or sit up straight. (*Id.* at 19, 29, Pg ID 2150, 2160.) Mr. Stevens was buckled over and could hardly walk. (*Id.* at 29, Pg ID 2160.)

At 7:02 p.m., MDOC Registered Nurse Ruth Rouleau documented that Mr. Stevens was presented to the healthcare unit with gastrointestinal symptoms. (Med. Record at 139, ECF No. 143 at Pg ID 2342.) She testified that the time entry in the medical records does not reflect when an event occurred, but when the entry was made. (Rouleau Dep. at 69, ECF No. 157-23 at Pg ID 3418.) Nurse Rouleau recalled that Mr. Stevens had been brought to the healthcare unit at approximately 6:40 p.m. (*Id.* at 65, Pg ID 3414.)

Nurse Awosika, who saw Mr. Stevens pursuant to Nurse Rouleau's referral, testified that Mr. Stevens was talking and was not in distress when he came into healthcare. (Awosika Dep. at 62, ECF No. 142-2 at Pg ID 1685.) Mr. Stevens was vomiting, however. (*Id.* at 63, Pg ID 1686.) Nurse Awosika testified that when he saw Mr. Stevens, it did not occur to him that Mr. Stevens' symptoms were related to hyperkalemia due to the fact that he was having prior abdominal problems and his symptoms were consistent with gastritis. (*Id.* at 65, 99, Pg ID 1689, 1722.)

As Nurse Awosika was evaluating Mr. Stevens, someone brought Mr. Stevens' lab results to him, reflecting a critically high potassium level over seven. (*Id.* at 66, Pg ID 1690; Med. Record at 141, ECF No. 143 at Pg ID 2344.) Nurse Awosika had not asked about the lab results prior to seeing Mr. Stevens because, he testified, the MDOC nurses know to expect results and to notify the provider

when the results arrive. (Awosika Dep. at 56-57, ECF No. 142-2 at Pg ID 1679-80.)

According to DMC records, the lab reported the results of Mr. Stevens' blood work to MDOC nursing staff in a telephone call to the facility at 7:47 p.m.[5] (ECF No. 142-9 at Pg ID 2031; ECF No. 165-1.) The lab report reflects that it was sent by fax at 4:39 p.m.[6] (ECF No. 157-20.) No individual is assigned to wait at the fax machine for lab results to arrive. (Awosika Dep. at 32, ECF No. 142-2 at Pg ID 1655; Jayawardena Dep. at 32 ECF No. 142-3 at Pg ID 1786.) The fax machine receives facsimiles for the prison generally, not only healthcare. (Jayawardena Dep. at 32, ECF No. 142-3 at Pg ID 1786.) The fax machine is MDOC property and is managed by the health unit manager, an MDOC employee, to whom the duty to get faxes is delegated. (Jayawardena Dep. at 73-74, ECF No. 142-3 at Pg ID 1827-28, 1830; Lacey Dep. at 55, ECF No. 166 at Pg ID 3632.)[7] An MDOC policy directs its nurses to call critical lab values to the doctor. (Lacey Dep. at 55, ECF No. 166 at Pg ID 3632.) Nurse Rouleau, who was employed by

---

[5] Plaintiff interprets one of the records as reflecting that DMC called healthcare regarding Mr. Stevens' lab results at 4:32 p.m. and at 4:57 p.m. (*See* ECF No. 142-9.) Nurse Awosika and Dr. Jayawardena argue that there is no admissible evidence to support this asserted fact. (*See* ECF No. 165 at Pg ID 3571.) The record does not identify the number that was called. There is no dispute that the lab did not speak to anyone in the healthcare unit concerning Mr. Stevens' lab results until 7:47 p.m.

[6] The record does not reflect the number to which it was faxed. (ECF No. 157-20.)

[7] Robert Lacy, D.O. is the Medical Director of Corizon.

24

MDOC, testified that how often the nurses check the fax machine for lab results depends on what is happening in the facility; the timing varies. (Rouleau Dep. at 26, 35, ECF No. 157-23 at Pg ID 3375, 3384.) The MDOC nurses expect that they will receive a phone call from the lab in addition to a fax. (*Id.* at 27, Pg ID 3376.) As a nurse practitioner, working for Corizon, Nurse Awosika is not responsible for checking the fax machine. (Lacey Dep. at 55, ECF No. 166 at Pg ID 3632.)

After seeing the report of Mr. Stevens' blood work, Nurse Awosika called for an ambulance to take Mr. Stevens to the hospital. (Awosika Dep. at 67, ECF No. 142-2 at Pg ID 1690.) Healthcare must notify the facility's control center when someone needs to go to the hospital. (Rouleau Dep. at 22, ECF No. 157-23 at Pg ID 3371; Marshall Dep. at 15, ECF No. 142-7 at Pg ID 1911.) Healthcare has no control over ordering an ambulance or when it arrives. (Rouleau Dep. at 67, ECF No. 157-23 at Pg ID 3416.)

An entry in the MDOC log book at 6:50 p.m. reflects that Nurse Awosika requested an ambulance and Universal Ambulance was called (ECF No. 142-8.) As of 7:20 p.m., the ambulance had arrived at the facility and been cleared by security. (*Id.*) Fifteen minutes later, at 7:35 p.m., the log book reflects that the ambulance departed to Receiving Hospital with Mr. Stevens and a corrections officer to accompany him. (*Id.*)

In the interim, Nurse Awosika did not administer Kayexalate to Mr. Stevens because he was vomiting and the facility does not have Kayexalate in its rectal form. (Med. Record at 141, ECF No. 143 at Pg ID 2344; Awosika Dep. at 93-94, ECF No. 142-2 at Pg ID 1716-17.) Nurse Awosika monitored Mr. Stevens to make sure he did not go into cardiac arrest, which is a risk of hyperkalemia. (*Id*. at 93, Pg ID 1716) Nurse Awosika recorded that Mr. Stevens' condition was stable upon departure to the hospital. (Med. Record at 143, ECF No. 143 at Pg ID 2346.)

Later in the evening, Detroit Receiving Hospital contacted the facility to indicate that Mr. Stevens had died at 8:23 p.m. (*Id*.) The record from Universal Ambulance reflects that Mr. Stevens' went into cardiac arrest in route to the hospital. (ECF No. 157-21.)

## III. Applicable Law

Plaintiff asserts § 1983 claims against Defendants for the violation of Mr. Stevens' rights under the Eighth and Fourteenth Amendments. Specifically, Plaintiff alleges that Defendants were deliberately indifferent to Mr. Stevens' serious medical needs. Specifically, Plaintiff claims Nurse Boles was deliberately indifferent upon learning that Mr. Stevens' catheter was dislodged on August 2, 2014, and that the remaining defendants were deliberately indifferent when Mr. Stevens' reported feeling ill on August 4, 2014.

"Section 1983 establishes 'a cause of action for deprivation under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States.' " *Jones v. Muskegon Cty.*, 625 F.3d 935, 940-41 (6th Cir. 2010) (quoting *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 656 (6th Cir. 1994)). A plaintiff asserting a § 1983 claim must show: "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The MDOC Defendants are undoubtedly state actors. Defendants working for Corizon or CharDonnay—entities providing services to MDOC inmates under a contract with the State—are deemed to be acting under color of state law for purposes of § 1983, as well. *West v. Atkins*, 487 U.S. 42 (1988).

The Eighth Amendment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward [the inmate's] serious medical needs." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An Eighth Amendment deliberate indifference claim has two components—one subjective and one objective. *Id.*

To satisfy the objective component, the plaintiff must demonstrate "the existence of a 'sufficiently serious' medical need." *Jones*, 625 F.3d at 941

(quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted)). A sufficiently serious medical need is one " 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " *Id*. (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

The subjective component requires proof "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he [or she] did in fact draw the inference, and that he [or she] then disregarded the risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). The Supreme Court has advised that " 'an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under [the Supreme Court's] cases be condemned as the infliction of punishment.' " *Id*. (emphasis in original) (quoting *Farmer*, 511 U.S. at 838). However, the Court also has warned that a prison official may "not escape liability if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risks he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8.

"[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703 (citing *Estelle*, 429 U.S. at 106; *Farmer*, 511 U.S. at 835). When the defendant "provides

treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id.* Yet, the plaintiff does not have to show that the defendant "acted 'for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (quoting *Farmer*, 511 U.S. at 835).

"Officials, of course, do not readily admit this subjective component, so 'it is permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge.' " *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (unpublished) (brackets omitted) (quoting *Comstock*, 273 F.3d at 703). "A genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005). " '[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious[.]' " *Preyor*, 248 F. App'x at 643-44 (quoting *Farmer*, 511 U.S. at 842).

## IV.    Analysis

### A.    Nurse Boles

There is a genuine issue of material fact with respect to whether Nurse Boles was aware that Mr. Stevens' catheter had been dislodged on Saturday, August 2, 2014, based on Dr. Jayawardena's testimony regarding what Nurse Boles told her

about the catheter on Tuesday, August 5. Plaintiff still must show, however, that

Mr. Stevens suffered from a serious medical condition when Nurse Boles

encountered him on August 2, and that Nurse Boles was deliberately indifferent to

that serious medical condition.

Nurse Boles admitted in her Answers to Plaintiff's Request for Admissions

that she knew Mr. Stevens suffered from Stage V renal failure and had

occasionally experienced hyperkalemia during his incarceration. (ECF No. 122 at

Pg ID 1229.) Undoubtedly, Stage V renal failure and hyperkalemia are serious

medical conditions. Plaintiff presents no evidence suggesting that Mr. Stevens was

suffering from hyperkalemia on Saturday, August 2, however. Mr. Stevens was

being treated for his renal failure. As part of that treatment, he received dialysis

every Monday, Wednesday, and Friday. He received his treatment the day before

Nurse Boles saw him. Therefore, when she encountered Mr. Stevens, he had not

yet missed any treatments. There is no indication that Mr. Stevens exhibited any

signs or symptoms of a serious medical condition on Saturday, August 2. In fact,

Plaintiff alleges in her Complaint that Mr. Stevens "first" became seriously ill on

August 3, 2014. (Am. Compl. ¶ 38, ECF No. 118 at Pg ID 1199.)

The question is whether Nurse Boles was aware of facts from which the

inference could be drawn that the dislodging of Mr. Stevens' catheter port posed a

substantial risk of serious harm to him. The fact that another medical provider

might have reported the problem to a physician immediately or that Nurse Boles testified that she would have done so if she in fact had been made aware of Mr. Stevens' condition (she denies that she was) may suggest that Nurse Boles acted negligently, but that is not the standard for an Eighth Amendment deliberate indifference claim.[8]  The fact that medical providers may routinely take certain steps in response to specific events or conditions does not necessarily mean that they perceive a serious risk of harm if they fail to take those steps.

There is evidence that dialysis treatments are frequently missed.  Dr. Hillyer testified that 5-10% of treatments "can be missed."  (Hillyer Dep. at 15, ECF No. 157-25 at Pg ID 3449.)  Nurse Awosika testified that some patients will go without dialysis for days.  (Awosika Dep. at 106, ECF No. 142-2 at Pg ID 1729.)  Dr. Lacy testified that if he saw a patient on a Monday who looked asymptomatic, had been dialyzed on Friday, missed his appointment on Monday, and was going to the hospital the following day to have his catheter replaced, he would not be more concerned.  (Lacy Dep. at 58-59, ECF No. 166 at Pg ID 3637-38.)  Dr. Jayawardena testified that CharDonnay's protocol provides that patients are not sent to the hospital unless they have missed three dialysis sessions and that

---

[8] Nurse Boles' acknowledgement of the risk to patients if they miss a dialysis treatment and what actions she would take in that situation are not necessarily instructive, as Mr. Stevens had not missed a dialysis treatment when Nurse Boles allegedly interacted with him.

CharDonnay does not consider missing two dialysis sessions that important. (Jayawardena Dep. at 49, ECF No. 142-3 at Pg ID 1803.)

Therefore, the evidence does not demonstrate the existence of a sufficiently serious medical need when Nurse Boles encountered Mr. Stevens. The record also does not reflect that Nurse Boles was " 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed],' " and that she " 'dr[e]w the inference.' " *See Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010) (quoting *Farmer*, 511 U.S. at 837). She is entitled to summary judgment.

### B.    Dr. Jayawardena

After conferring with Nurse Marshall, Dr. Jayawardena completed the paperwork necessary for Mr. Stevens' catheter to be replaced the following morning and then requested to see Mr. Stevens to assess his condition. When she met with Mr. Stevens, he appeared normal and complained only of "burping," relating that he had felt bloated, nauseous, and sick since eating rice and shredded beef over the weekend. Dr. Jayawardena determined that Mr. Stevens' symptoms were gastrointestinal and prescribed Zantac. Mr. Stevens had a history of GERD. There is no indication that Mr. Stevens exhibited the few symptoms that may be indicative of hyperkalemia. Dr. Jayawardena verbally informed Nurse Awosika that Mr. Stevens had not been dialyzed that day, that a new catheter placement was

scheduled for the following day, and that stat labs had been ordered.  She left the facility shortly thereafter and had no further involvement with Mr. Stevens.

A reasonable jury could not find Dr. Jayawardena deliberately indifferent to Mr. Stevens' serious medical needs.  Even if Dr. Jayawardena misdiagnosed Mr. Stevens' condition, this is insufficient to show that she disregarded a perceived risk of harm to him.  *See Rouster v. Cty. of Saginaw*, 749 F.3d 437, 447-50 (6th Cir. 2014) (finding no deliberate indifference where medical provider interpreted the prisoner's symptoms as indicative of relatively minor conditions, gas and diarrhea, when in fact he suffered from a perforated duodenal ulcer, which resulted in sepsis causing his death); *Jones v. Muskegon Cty.*, 625 F.3d 935, 944 (6th Cir. 2010) (finding no deliberate indifference where a doctor examined a patient complaining of sharp stomach pains, rapid weight loss, and other bowel complaints and concluded that he suffered from severe constipation and prescribed over-the-counter medication and the prisoner was later treated at a hospital and diagnosed with cancer).  This is not a case where the treatment Mr. Stevens received was "so cursory as to amount to no treatment at all[.]"  *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Of course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all.").

## C.    ARUS White

There is a genuine issue of material fact with respect to ARUS White's knowledge of Mr. Stevens' condition on August 4, 2014, and her response thereto. ARUS White claims that Mr. Stevens approached her as she was leaving for the day, indicating only that he had a stomach ache, nothing more.  Mr. Jordan testified that he heard Mr. Stevens tell ARUS White that he was sick and wanted to go to healthcare and she told him to go back to his cell, that she was tired of him, and that he would not be sent to healthcare.  According to Mr. Jordan, this was around 3:10 p.m.  ARUS White testified that she left the unit between 2:30 and 3:30 on the day Mr. Stevens died.  The Court must accept Mr. Jordan's version for purposes of deciding ARUS White's summary judgment motion.  *See Liberty Lobby, supra*.

The question then is whether there are facts supporting ARUS White's subjective knowledge of a serious or substantial risk to Mr. Stevens.  In other words, was there information available to ARUS White indicating that Mr. Stevens had a serious medical need.  There is little information in the record reflecting what condition Mr. Stevens was in when he approached ARUS White.

In a letter dated August 19, 2014, Mr. Frick wrote that at about 2:30 p.m. on August 14, Mr. Stevens was vomiting, had a headache, and had no feeling in his arms[] and legs" and that he said his arms and legs "were like rubber."  (ECF No.

167-2 at Pg ID 3803.)  According to Mr. Frick, "[w]hen [Mr. Stevens] stood to get dress[ed] he almost fell and hit his head on the desk in the room." (*Id.*)  Mr. Frick wrote that when Mr. Stevens went to see CO James at the podium, ARUS White was standing there too. (*Id.*)  Mr. Frick also wrote, however, "CO James and ARUS White started badgering Mr. Stevens because he couldn't tell them what's wrong with him" and Mr. Stevens "told them that he had a headache[.]" (*Id.*)  Additionally, Mr. Frick reports that about ten minutes later, Mr. Stevens was called to go to the dialysis unit, where he saw Nurse Marshall who took his vitals and "said everything was fine." (*Id.*)

According to Mr. Jordan, Mr. Stevens was vomiting before count time at 3:20 p.m. (Jordan Dep. at 17, ECF No. 142-13 at Pg ID 2148.)  There is no evidence suggesting that ARUS White was informed or was aware that he had been vomiting.  Mr. Jordan did provide that ARUS White did not know Mr. Stevens was vomiting a feces-like substance, and he testified that this started after ARUS White left for the day. (*Id.* at 27, Pg ID 2158.)  Mr. Jordan further testified that Mr. Stevens began moaning and groaning a little before 3:00 p.m.. (*Id.* at 33, Pg ID 2164.)  ARUS White did know that Mr. Stevens already had been to healthcare earlier in the day. (White Dep. at 32, ECF No. 139-2 at Pg ID 1461.)

As stated in Section III above, the subjective component requires proof "that the official being sued subjectively perceived facts from which to infer substantial

35

risk to the prisoner, that he [or she] did in fact draw the inference, and that he [or she] then disregarded the risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837). There must be facts from which ARUS White could have inferred a substantial risk of harm to Mr. Stevens. The record is devoid of evidence from which to conclude that the risk of serious harm to Mr. Stevens should have been obvious to ARUS White. Absent such evidence, ARUS White cannot be found to have violated Mr. Stevens' constitutional rights even if her response to his request to go to the healthcare unit was punitive, unkind, and/or harsh.

### D.    CO James

Unlike ARUS White, the record reflects that CO James was informed of Mr. Stevens' deteriorating condition for several hours before he finally went to healthcare at about 7:00 p.m. In addition to her encounter with Mr. Stevens while ARUS White was present, several inmates approached CO James on multiple occasions concerning Mr. Stevens' condition, including the fact that he was vomiting violently and had regurgitated a fecal-like substance. Mr. Frick also testified that there was vomit on the floor in Mr. Stevens' cell, which CO James would have seen when she made rounds. (Frick Dep. at 27, ECF No. 167-3 at Pg ID 3833.)

For these reasons, CO James' request for summary judgment is denied.

### E. Nurse Awosika

Plaintiff does not dispute the adequacy of Nurse Awosika's response to Mr. Stevens' condition when he arrived in healthcare at approximately 7:00 p.m. on August 4, 2014. Plaintiff argues, however, that Nurse Awosika was aware of sufficient facts before that time to warrant an earlier response. Specifically, Plaintiff maintains that Nurse Awosika should have checked for the DMC lab results and on Mr. Stevens' condition before he was presented to healthcare.

Until Nurse Awosika received the DMC lab report, however, he did not know (and could not have known) that Mr. Stevens was suffering from hyperkalemia. Instead, he knew that Mr. Stevens had been seen by Dr. Jayawardena with gastrointestinal symptoms and had been treated for those symptoms. Nurse Awosika's liability cannot be premised on the actions or errors of others, specifically the purported failure of the MDOC nursing staff to regularly check the fax machine for Mr. Stevens' lab results.[9] *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991) (liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants."). Further, Nurse

_____

[9] Notably, MDOC protocol required the MDOC nurses to report the lab results to Nurse Awosika once they were received. He testified that he therefore expected to be made aware of Mr. Stevens' lab results as soon as the lab reported them.

Awosika's liability cannot be premised on his asserted failure to look for the lab results before they were reported to him.

The Sixth Circuit rejected a similar approach to holding a medical provider liable in *Baker-Schneider v. Napolean*, 769 F. App'x 189, 193 (6th Cir. 2019). As the court explained in that case, the liability of a defendant medical provider "does not hinge on whether she should have logged onto her computer to review [the inmate's medical history]." *Id*. Instead, the court wrote, the focus is the defendant's "actions given the knowledge she possessed when she examined [the inmate]." *Id*.

For these reasons, the Court concludes that the subjective component required to establish Nurse Awosika's deliberate indifference to Mr. Stevens' medical needs has not been satisfied.

## V. Conclusion

In summary, the Court holds that Defendants, except CO James, are entitled to summary judgment with respect to Plaintiff's claim that they violated Mr. Stevens' constitutional rights.

Accordingly,

**IT IS ORDERED** that Defendant Jayawardena and Awosika's motion for summary judgment (ECF No. 142) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant White and James' motion for summary judgment (ECF No. 139) is **GRANTED IN PART AND DENIED IN PART** in that summary judgment is granted to Defendant White, but denied as to Defendant James.

**IT IS FURTHER ORDERED** that Defendant Boles' motion for summary judgment (ECF No. 149) is **GRANTED**.

**IT IS FURTHER ORDERED** that all defendants, except Defendant James, are terminated as parties to this action.

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 31, 2020